UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

JOHN LEVAINE,

                   Plaintiff,                           Case No. 15-cv-11084

v                                              Honorable Thomas L. Ludington

TOWER AUTOMOTIVE
OPERATIONS USA I LLC,

                   Defendant.

_____/

**ORDER CANCELLING ORAL ARGUMENT, GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, DISMISSING COUNTS 2, 4, AND 5 OF PLAINTIFF'S COMPLAINT WITH PREJUDICE, AND DISMISSING COUNTS 3 AND 6 OF PLAINTIFF'S COMPLAINT WITHOUT PREJUDICE**

Plaintiff John Levaine filed suit against his former employer, Defendant Tower Automotive Operations USA I LLC ("Tower") on March 24, 2015, asserting federal question jurisdiction pursuant to 28 U.S.C. § 1331. *See* Compl., ECF No. 1. Plaintiff alleges that Defendant Tower wrongfully terminated him from his position as a production welder in violation of his labor agreement, the Worker's Disability Compensation Act ("WDCA"), M.C.L. § 418.301(11), the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2611, *et seq*., and Michigan's Persons with Disabilities Civil Rights Act ("PWDCRA"), M.C.L. § 37.1201. Plaintiff also brought a claim against his former union, Defendant United Steelworkers of America Local 2-628 (the "Union") alleging that it had breached its duty of fair representation, but has since dismissed the Union from this action. *See* Compl. ¶¶ 41-45; ECF No. 12.

On March 28, 2016 Defendant Tower filed a motion for summary judgment, seeking judgment on Levaine's remaining claims. *See* Mot. for Summ. J., ECF No. 28. Because Plaintiff

Levaine has not established a claim under the FMLA, summary judgment will be granted as to both his interference and his retaliation claims. Summary judgment will also be granted as to Plaintiff's claim that Defendant Tower breached the labor agreement. Because the Court no longer has subject matter jurisdiction over the remainder of the action, Plaintiffs' state law claims will be dismissed without prejudice, and Plaintiff will be allowed to refile them in State Court.

**I.**

The relevant facts underlying the instant dispute begin on November 21, 1996, at which time Plaintiff Levaine completed an application for employment with Active Tool and Manufacturing Company ("Active Tool") at a facility in Elkton, Michigan. *See* ECF No. 28 Ex. 1. As part of his application, Plaintiff agreed that, "in consideration for my employment, I shall not commence any action or other legal proceeding relating to my employment or the termination thereof more than six months (unless a shorter period is provided by law) after the event complained of and agree to waive any statute of limitations to the contrary." *Id*. at p. 5. The application, signed by Plaintiff, further provides that the application "constitutes the entire agreement between the company and myself and that any and all prior agreements are null and void, and that nothing in any documents published by the company, either before or after this agreement, shall in any way modify the above terms." *Id*. Finally, the application provides that the agreement could only be modified by a written document, specifically referring to the agreement, and signed by the president of Active Tool. *Id*.

Plaintiff's application for employment was accepted by Active Tool, and Plaintiff commenced his employment as a production worker on January 2, 1997. *See* Levaine Dep. at 24.

As part of his employment Plaintiff became a member of the Union, and was therefore subject to a labor agreement between the company and the Union.

In July of 1999 Active Tool's Elkton facility was acquired by Defendant Tower. *See* Roestel Aff., ECF No. 28 Ex. C. Following the acquisition Plaintiff was not required to complete a new employment application. Instead, his Active Tool employment application became part of his personnel file with Tower. *Id*. Plaintiff also retained his Union membership, as Defendant Tower entered into a labor agreement with the Union recognizing the Union as the exclusive representative for Tower employees for the purpose of bargaining with respect to conditions of employment and grievances or disputes. *See* ECF No. 28, Ex. F ("Labor Agreement").

## A.

The Labor Agreement provided to the Court by Defendant Tower did not become effective until January 17, 2015, or five months after Tower terminated Levaine's employment. *See* Labor Agreement, ECF No. 28 Ex. F. Despite this discrepancy, Plaintiff concedes that the employment agreement introduced by Defendant is similar to previous agreements in material respects. *See* Resp. to Summ. J. 7, ECF No. 30; Levaine Dep. pp. 41-43, 60-64.

The Labor Agreement contains an "Absenteeism Agreement" section that establishes the procedure for reporting work absences. *See* Labor Agreement 50. Pursuant to that section, "[i]ntended absence because of sickness, injury, or death-in-immediate-family must be reported to Elkton Business Unit Human Resources prior to the start of shift." *Id*. The Absenteeism Agreement provides an exception to this notice requirement where the employee "was unable 'for good reason' to notify the Company prior to the start of shift, and/or as soon as possible in case of incapacity[,]" in which case notification can be made within the first hour of an

employee's scheduled shift. *Id.*   An employee may be terminated after seven unexcused absences, or after five incidents of tardiness, five incidents of leaving early, or five incidents of failing to punch in on the timeclock.  *Id.* 54-55. Furthermore, an employee could be terminated for ten incidents of any combination of tardiness, leaving early, or failing to punch in.  *Id.*

The section of the Labor Agreement entitled "Shop and Safety Rules and Regulations" establishes a progressive discipline policy for violations of company rules. *See* Labor Agreement 50.  While most offenses require progressive discipline under the labor agreement, serious violations including "[h]arassment or improper conduct" as defined by Tower's anti-harassment policy could result in immediate termination. *Id.* 54. Tower's anti-harassment policy, in turn, prohibits any unlawful harassment or any improper conduct that is contrary to Tower's "value of treating everyone with dignity and respect."  *See* Employment Practices 7, ECF No. 28 Ex. K. Whether employee rises to the level of improper conduct is determined by Defendant Tower "in its sole discretion…." *Id.* at 6.

The anti-harassment policy also establishes a complaint procedure by which any person in the work place who believes that they have been the victim of harassment or improper conduct, or witnesses an incident of harassment or improper conduct, must report the conduct to Tower's human resources department. *Id.* at 7. Tower is then required to conduct or direct a prompt investigation of the allegations, ideally involving a written statement from the complainant and interviews of any person with knowledge or information regarding the occurrence. *Id.* Tower then must take corrective steps to prevent further harassment or improper conduct. *Id.*  If Tower concludes that an employee has engaged in harassment or improper conduct, then that employee will be subject to disciplinary action, "up to and including discharge." *Id.* A person found guilty of harassment or improper conduct then has the ability to

- 4 -

challenge the corrective or disciplinary action. *Id*. Plaintiff testified at his deposition that he was familiar with the anti-harassment policy, and knew that the policy meant that employees "cannot harass or threaten a foreman or anything like that. Everybody knew in the shop because people had got fired before for it." Levaine Dep. 65-66.

**B.**

Plaintiff Levaine began his employment with Defendant Tower as a production line worker primarily assigned to the midnight shift. *See* Levaine Dep. 70. Levaine eventually moved to a welder position around 2012, at which time he was assigned to the day shift. *Id.* at 20. During the relevant time period, Levaine reported to a variety of supervisors, including Steven Kreider, Ryan Paxton, and Al Whittredge. *See* Kreider Dep. 8. Those supervisors, in turn, reported to Jeff Muether, who reported to the plant manager, Bill Junge. *Id*. at 6. At some point, Levaine was elected both Chief Steward and Steward of the Union for his shift.

**i.**

While working for Tower, Levaine suffered from a knee injury on at least three separate occasions. *Id*. at 71-76. Levaine believes that he initially injured his knee slipping on oil while the facility was still owned by Active Tool. *Id*. at 71. He testified that he was placed on leave for less than six months following the first injury, and that he was subject to some work restrictions upon his return. *Id*. at 71-73. Levaine believed that he had filed a workers compensation claim related to that injury, but was not certain of the details. *Id*.[1] He also testified that he had suffered from a second knee injury at some point, but had no recollection of it. *Id*. at 75-76. He did not recall if the second injury led to any workers compensation case or any kind of settlement. *Id*.

---

[1] While the parties agree that Levaine previously filed workers compensation claims against Defendant Tower, neither party has provided the Court with any documents relating to those claims other than Plaintiff's own deposition.

- 5 -

Plaintiff Levaine injured his knee for a third time in 2006 after his foot became stuck in a wire. *Id*. After reporting the injury, Levaine was placed on restrictions and assigned to jobs that allowed him to remain seated or reclined. *Id*. at 76. Levaine did not recall how long he performed the restricted assignments. Plaintiff Levaine testified that Defendant Tower eventually informed him that he would either need to go off of restricted work and return to his normal press operator job or go on sick and accident leave. *Id*. at 77.   After his doctor would not clear him for unrestricted work Levaine went on accident leave. *Id*.

With respect to his third injury Plaintiff Levaine filed a workers compensation claim pursuant to the WDCA. *Id*. at 78. The case, filed in 2006, was resolved in 2008. *Id*. at 88. Levaine's injury was resolved after he underwent surgery at some point.  Due to his seniority level with the company, however, Levaine remained on layoff until 2011, at which time he returned to work without any medical restrictions. *Id*. at 78-79.

Levaine testified that no manager or supervisor ever told him that he should not have filed workers compensation claims. Instead, upon his return a member of Human Resources support staff, Dan Glaza, told Plaintiff that any issue between him and Defendant Tower was in the past, and that they were starting with a clean slate. *Id*. at 80-81. Levaine also testified that he was not aware of any documents suggesting that Defendant Tower viewed his workers compensation claims negatively. *Id*. at 81.

### ii.

Plaintiff Levaine also applied for, and was granted intermittent FMLA leave on two separate bases during his time with Defendant Tower.   First, in 2006 Levaine obtained intermittent FMLA leave to care for his wife's serious medical condition.  Levaine reapplied for

FMLA leave to care for his wife on December 12, 2012, which Defendant Tower again approved on January 9, 2013. *See* Mot. for Summ. J. Ex. L, Ex. M.

Second, on October 11, 2013 Levaine applied for intermittent FMLA leave for his own serious health condition. *See* Mot. for Summ. J. Ex. N.  Levaine testified that his need for FMLA leave arose from an incident in which a fellow employee pushed him, resulting in work-related stress and anxiety. *See* Levaine Dep. 88-89. 126. Defendant Tower approved Plaintiff Levaine's FMLA request on November 19, 2013, and recertified its approval on July 31, 2014. *See* Mot. for Summ. J. Ex. N.

### iii.

Throughout his employment with Defendant Tower, Plaintiff Levaine received numerous written reprimands and written warnings.  *See* ECF No. 28, Ex. D.  In his deposition, Levaine acknowledged that "I've got so many of these write-ups I can't remember from time to time." Levaine Dep. 97.  Levaine contested a number of his write-ups, believing that he was being disciplined for actions that other employees were not disciplined for, and that the write-ups constituted retaliation for his FMLA and WDCA claim. *Id.* at 87.  He stated that he had no evidence that he was being retaliated against, but that he subjectively felt that he was being harassed. *Id.* at 93-104.

 Many of Levaine's write-ups fell under Shop Rule 19, subsequently re-listed as Shop Rule 8, requiring employees to provide Tower with a full day's work for a full day's pay.  *See* Labor Agreement p. 52.  *See also* ECF No. 28, Ex. D 2 (written warning for violation of shop rule 19 issued on May 4, 2006 and signed by Plaintiff Levaine); *Id.* at 4 (written reprimand for violation of shop rule 19 issued on September 19, 2006, which Plaintiff Levaine refused to sign); *Id.* at 7 (written warning for violation of shop rule 8 issued on July 23, 2013, which Plaintiff

Levaine refused to sign); *Id*. at 8 (written reprimand for violation of shop rule 8 resulting in a single day suspension issued on October 2, 2013, which Plaintiff Levaine refused to sign); *Id*. at 9 (written reprimand for violation of shop rule 8 resulting in a three-day suspension issued on October 3, 2013, which Plaintiff Levaine refused to sign). *Id*. at 19 (written notice of violation of fourth violation of shop rule 8 resulting in a week-long suspension issued on July 8, 2014, and signed by Plaintiff Levaine).

Levaine was also issued numerous write-ups for failing to follow instructions pursuant to Shop Rule 10. *See* Labor Agreement p. 52. *See also* ECF No. 28, Ex. D 5 (first notice of violation of Shop Rule 10 issued on June 11, 2012 and signed by Plaintiff); *Id*. at 6 (written notice of second offense for violation of Shop Rule 10 resulting in a single day suspension issued on December 6, 2012 which Plaintiff refused to sign); *Id*. at 10 (written notice of fourth offense for violation of Shop Rule 10 resulting in a week-long suspension issued on November 15, 2013, which Plaintiff refused to sign); *Id*. at 11 (written notice of third offense for violation of Shop Rule 10 resulting in a three-day suspension issued on January 27, 2014 and signed by Plaintiff).

Defendant also alleges that in a 2013 incident Levaine was investigated for verbally threatening a supervisor during an argument, saying "I'll take care of it my way" in response. *See* Mot. for Summ. J. Ex. C. Roestel Aff. No discipline was issued to Levaine because Human Resources could not confirm that a threat had taken place. *Id*. At the time of his termination, Plaintiff Levaine had received three uncontested written reprimands for unexcused tardiness, and three uncontested written reprimands for unexcused absences for the 2014 year. *Id*. at 12-15, 17-18.

**iv.**

In January of 2014, Plaintiff Levaine filed a written complaint with the Department of Labor alleging FMLA interference and retaliation. Levaine's claim apparently related to an incident that took place on the day of the company Christmas luncheon on December 12, 2013. *See* Resp. to Summ. J. Ex. 2.  According to Levaine, on that date fellow employees were released from their work stations up to 45-minutes early to attend the Christmas luncheon. Levaine Dep. 127-128.  Levaine, who had recently been disciplined for leaving his work stations two minutes early, became extremely upset and approached Mr. Paxton for permission to leave early. *Id*. at 128.  Levaine testified that Mr. Paxton stated "I'm sorry you feel this way about this, but if you have to go home, go on home.  I hope you feel better tomorrow." *Id*. Levaine then left, believing that his absence would be excused under the FMLA. *Id*. at 129.  He arrived at work the next day to find that the absence had not been excused, and that he had been written up. *Id.*  He responded by filing his complaint with the Department of Labor alleging that the absence should have been excused pursuant to his intermittent FMLA leave.[2]

On May 14, 2014 Plaintiff Levaine filed a harassment complaint against two of his supervisors, Mr. Kreider and Mr. Paxton, pursuant to the Labor Agreement.  *See* Resp. to Summ. J. Ex. 3. Plaintiff claimed that both supervisors had been harassing him to increase his production despite the fact that he was performing his work as fast as he could, and that he was trying to avoid another write-up, which he understood could result in the termination of his employment with Defendant Tower. *Id*. Plaintiff Levaine also complained that on April 30, 2014 after returning from FMLA leave he was questioned by Mr. Muether regarding a plastic wheel, or spool, he had taken that he did not have a "shipper" for.  *Id*.  Mr. Muether allegedly informed

---

[2] Plaintiff has provided the Court with a single email in which Defendant disputed a Department of Labor employee's contention that a violation of the FMLA had occurred. *See* Resp. to Summ. J. Ex. 2.  Defendant ended the email by stating that it would not change the absence from unexcused to FMLA leave.  *Id*.  The Court has not been provided any further evidence regarding how Plaintiff's complaint was ultimately resolved by the Department of Labor.

him that he was required to have a shipper for any parts that he took home, and Plaintiff allegedly responded that "I always been taking these home for call up work and [Mr. Paxton] knows it."  When Mr. Muether asked Levaine whether Mr. Paxton had given him permission to take a part that day, Plaintiff Levaine alleged that he had not, but that Mr. Paxton had given him permission in the past. Mr. Muether replied that he would need to talk with Mr. Paxton about this practice. *Id.*  Plaintiff Levaine stated in his harassment complaint that he was very upset about the ordeal with Mr. Muether, and believed that the confrontation had been previously arranged by Mr. Paxton.  Plaintiff Levaine also referred to an incident on May 1, 2014 in which he was verbally reprimanded by Mr. Paxton for taking out his earplugs on the floor and for not properly filling out a time card. *Id.* Finally, Levaine stated that his supervisor was watching him twice a day for about 15 minutes. *Id.* Plaintiff Levaine argued that as a result of the alleged harassment he was experiencing increased stress, and therefore requested that a different supervisor be assigned to oversee his work. *Id.*

In response to Levaine's complaint, Mr. Kreider explained that, while the daily production requirement for the each person was 10 to 12 units, Levaine produced only 6 to 7 units per day, and that a fellow employee had also been addressed regarding production requirements. Mr. Kreider further stated that all employees were required to have a "shipper" if they wish to leave with parts, and that the confrontation Plaintiff had with Mr. Muether had not been planned by Mr. Paxton. *Id.*  Finally, Mr. Kreider stated that he had reminded Levaine more than once that he is required to turn in a timecard daily, and contested Levaine's claim that Mr. Kreider regularly watched him work. *Id.* The parties have not provided any documents regarding the outcome of Plaintiff's grievance.

### C.

- 10 -

The incidents giving rise to Plaintiff Levaine's termination began on July 29, 2014.

Regarding that date, Plaintiff testified as follows:

Q: On the 29th when you – you came to work and this is when you said that you were late to work due to your anxiety?

A: Um-hum.

Q: When did you first start having an anxiety attack that day?

A: Probably in the morning. I had to be there – I guess that shift started at five o'clock and I would have gotten up around four o'clock and I thought I could make it to work, I honestly thought I could make it to work and so I wasn't going to stop. When I knew – I was so close to work, but yet it didn't make sense to stop and call this answering service when I thought I could still make it to work and so I thought I could make it to work in time and when I got into work I was one or two minutes late, but there was no body at the front office to say – you have your first one or two hours with a legitimate excuse, as far as I know, to report why you're late.

Q: So at four o'clock when you woke up you knew you were having an anxiety attack.

A: I don't know exactly if it was at four o'clock.

Q: You thought that –

A: You know, during – throughout that period of getting dressed and that, yeah.

Q: And you didn't call then to say hey, I'm having an anxiety attack, I need FMLA.

A: I probably didn't feel that stressed out right then.

Q: And it wasn't – and what time did you leave your house?

A: Probably at – probably I guess it must have been late then, a little bit later or traffic was bad. It should have been right around – if I had to be in there at five, I usually will leave around 4:20.

Q: I'm trying to understand why it is that you were one or two minutes late that day.

> A: I must have either been thinking an anxiety attack.  I was driving my motorcycle, I know that, and maybe I was just thinking about maybe committing suicide. I don't know.

Levaine Dep. 137-38.  Upon arriving at work, Levaine informed a supervisor he was not assigned to, Mr. Whittredge, that his tardiness fell under his FMLA leave.  *Id.* at 138.  Levaine believed that Mr. Whittredge had accepted his explanation even though Mr. Whittredge did not say that the request was approved, and Levaine wrote FMLA on his timecard.  *Id.*  at 130, 138.  Plaintiff has presented no evidence that he provided Mr. Whittredge or Defendant with any explanation as to why he was unable to call ahead of time to notify Defendant of his need for FMLA leave as required by the Labor Agreement.

Two days later, on July 31, 2015, Mr. Kreider issued a disciplinary notice for Levaine's late arrival. Mr. Kreider asked Levaine and his union representative, Brent Shears, to meet with him in the bullpen to discuss the discipline, as was the general policy for fourth-attendance write-ups. *See* Levaine Dep. 130; Shears Dep. 10, Resp. to Summ. J. Ex. 8.  At the meeting, Mr. Kreider informed Levaine that he was being written up, to which Levaine stated that Mr. Kreider could not do that because his FMLA leave had already been approved by Mr. Whittredge. *See* Levaine Dep. 130.  Mr. Kreider stated that the front office had decided that the tardiness would be unexcused. *Id.* at 131.  When Levaine then indicated that he wanted to grieve the discipline, Mr. Kreider called his supervisor, Mr. Muether, into the meeting to begin the post-grievance process. *Id.*  After hearing Levaine's explanation for his late arrival, Mr. Muether decided that the group should speak to Mr. Whittredge.  *Id.* Mr. Muether first attempted to contact Mr. Whittredge by radio, which was unsuccessful, and then left the bullpen to find him.  Levaine followed.  *Id.*

Levaine testified that after following Mr. Muether fifteen to twenty feet down the hall, he turned to Mr. Shears and Mr. Kreider, who were still seated at the table. *Id*. "I took my right hand, I had the paper – the write up in my hand, I had my left hand by my side and I said I'm going to get you on this. That's what I said to him." *Id*. Levaine testified that he then turned around to catch up with Mr. Muether. *Id*. at

Mr. Shears, Levaine's union representative, testified as follows regarding the incident:

A:     I was within an arms-distance of [Levaine] which appeared to me he had the intent to do [Mr. Kreider] bodily harm and waived a write-up in his face probably about four inches from him and said I'll get you for this.

Q:     He appeared to have the intent to do bodily harm because –

A:     He was irate.

Q:     Did he have a weapon?

A:     No.  When you're in the state of emotion where you're going to do somebody great bodily harm, I can pretty will tell.

Q:     So he was pretty fired up?

A:     That's correct.

Q:     And based on the way he appeared you had no doubt whatsoever that –

A:     I thought he was going to swing at him or me, he was that worked up.  He was upset.

Shears Dep. 9.

Mr. Kreider also provided testimony regarding the incident:

A:     …we got up to leave the bullpen to follow [Mr. Muether] to go find [Mr. Whittredge] and that's when [Levaine] blocked off my path, shook his papers in his face and said I'm going to get you for this.

Q:     He shook the papers in his face?

A:     In my face.

Q:      Okay, when you say blocked off your path, what do you mean?

A:      The bullpen has a picnic table in the center of it, it's got three walls on it, had three walls on it, [Levaine] was to the south, I was at the north and when they crossed, they crossed my path he blocked the exit I had to leave.

Kreider Dep.  Mr. Muether testified that while he heard Plaintiff yelling after he left the bullpen, he did not specifically hear the alleged threat. Muether Dep. 12.  The three witnesses collectively described Levaine as "irate", "upset", "loud", "yelling", "hollering", "shaking", "escalating", and "agitated".  *See* Shears Dep. 9- 11, 16; Kreider Dep. 9, Muether Dep. 13, 14, 22.

Upon catching up with Mr. Muether and Levaine, Mr. Kreider asked Mr. Levaine either "Why did you threaten me?" or "What did you say to me?"  *See* Shears Dep. 8. While Levaine was still present, Mr. Muether took statements from Mr. Kreider and Mr. Shears, who both claimed that Plaintiff had threatened Mr. Kreider by stating "I'll get you for this."  Mr. Muether found the threat allegation particularly believable because Mr. Kreider, the foreman, and Mr. Shears, Levaine's own Union representative, both made the same claim. *See* Muether Dep. 13. After briefly attempting to talk with Mr. Whittredge, which he alleged was unsuccessful due to Levaine's behavior, Mr. Muether sent Levaine to the union office and sent Mr. Kreider to the other end of the building for Mr. Kreider's safety. *Id*. at 14.  After separating the parties, Mr. Muether again took statements from Mr. Kreider and Mr. Shears, who again independently corroborated the threat. *Id*. at 20.  Mr. Muether then obtained written statements from Mr. Kreider and Mr. Shears. *Id*. at 21. Mr. Muether spoke with Mr. Levaine about the incident, but did not take his written statement.  *Id*. at 24-25. Instead, Mr. Muether directed a human resources employee named Christine Covino to take Levaine's written statement. *Id*. at 48-52.

Defendant Tower placed Levaine on suspension pending the outcome of the investigation. *See* Mot. for Summ. J. Ex. J. Tower ultimately terminated Levaine's employment

on August 4, 2015 after finding that Levaine had threatened Mr. Kreider in violation of the company's anti-harassment policy. *Id.*

### D.

Plaintiff Levaine responded by filing the instant action against Defendant Tower and the Union on March 24, 2015. *See* Compl. On April 24, 2015 Plaintiff stipulated to the dismissal of the Union, effectively dismissing Count 1 of his complaint – that the Union had breached its duty of fair representation – and leaving his employer, Tower, the only defendant. *See* ECF No. 12. Following the close of discovery, Defendant Tower filed its motion for summary judgment as to all of Plaintiff's claims, which has been fully briefed and is now ready for decision.

### II.

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.[3]

---

[3] Plaintiff has requested that Defendant's motion for summary judgment be denied as a sanction for spoliation of evidence. The request will not be granted. As an initial matter, this Court does not entertain requests for affirmative relief within responses or replies. *See* Court Practice Guidelines. Alternatively, Plaintiff's argument that Defendant's Mr. Kreider committed spoliation is without merit. Plaintiff points to the fact that Mr. Kreider destroyed his handwritten notes regarding the incident after transcribing them the following day. Mr. Kreider testified that destroying such hand-written notes was his general practice. To show spoliation, a party must establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2)

**A.**

Plaintiff's breach of contract claim will be addressed first.  Defendant argues that, because Plaintiff has not shown a breach of duty by the Union, his breach of contract claim against his former employer fails as a matter of law. *See DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151 (1983) ("To prevail against either the company or the Union, employee-plaintiffs must not only show that their discharge was contrary to the contract but must also carry the burden of demonstrating a breach of duty by the Union.") (quotations, citations and alterations omitted).  Plaintiff does not address or contradict this claim in his response, effectively conceding Defendant's argument.  Plaintiff's breach of contract claim will be dismissed.

**B.**

Defendant also moves for summary judgment as to Plaintiff's two FMLA claims.  The FMLA entitles employees to an annual total of twelve weeks of leave for a number of reasons including, inter alia, because of a "'serious health condition that makes the employee unable to perform the functions of the position of such employee.' " *Arban v. West Publ'g Corp.*, 345 F.3d 390, 400 (6th Cir.2003) (quoting 29 U.S.C. § 2612(a)(1)(D)). Upon returning from FMLA leave, an employee must be reinstated to his position or an equivalent position in terms of pay, benefits, and other conditions of employment. 29 U.S.C. § 2614(a)(1). The FMLA makes it unlawful for any employer "to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided [by the Act]," 29 U.S.C. § 2615(a)(1), or to "discharge or in any other manner

---

that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense. *See Adkins v. Wolever*, 692 F.3d 499, 503-04 (6th Cir. 2012).  First, it is doubtful that any evidence was destroyed at all, since Mr. Kreider testified that he transcribed the notes the next day, thus preserving the evidence in a different form.  Second, Plaintiff has not established that Mr. Kreider had any obligation to preserve his handwritten notes at the time they were destroyed, much less that he destroyed them with a culpable state of mind.  Plaintiff's request will be denied.

discriminate against any individual for opposing any practice made unlawful by [the Act]." *Id*. at § 2615(a)(2).

The Sixth Circuit has recognized two discrete theories of recovery under the FMLA: (1) the "interference" theory arising under § 2615(a)(1), and (2) the "retaliation" theory arising from § 2615(a)(2). *Seeger v. Cincinnati Bell Telephone Co., LLC*, 681 F.3d 274, 282 (6th Cir. 2012). The main distinction between the two theories is the employer's intent. The interference theory has its roots in the FMLA's creation of substantive rights, and "[i]f an employer interferes with the FMLA-created right to medical leave or to reinstatement following the leave, a violation has occurred," regardless of the intent of the employer. *Id*. (quoting Arban v. West Pub. Co., 345 F.3d 390, 401 (6th Cir. 2003)). In contrast, the central issue raised by the retaliation theory is "whether the employer took the adverse action because of a prohibited reason or for a legitimate nondiscriminatory reason." *Id*. (quoting Edgar v. JAC Prods., Inc., 443 F.3d 501, 508 (6th Cir. 2006)). In other words, an employer's intent is relevant only in retaliation claims because those claims "impose liability on employers that act against employees specifically because those employees invoked their FMLA rights." *Id*. (citing Edgar, 443 F.3d at 508) (emphasis original). Plaintiff Levaine brings claims under both theories, which will be addressed in turn.

**i.**

Defendant first asserts that Plaintiff's FMLA interference claim cannot survive summary judgment. FMLA interference claims arise under 29 U.S.C. § 2615(a)(1), which provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided in this subchapter."

To establish a prima facie case of interference, a plaintiff must prove that: (1) he was an eligible employee; (2) the defendant was an employer as defined under the FMLA; (3) he was

entitled to leave under the FMLA; (4) he gave notice of his intention to take leave to his employer; and (5) the employer denied his FMLA benefits to which he was entitled. *Killian v. Yorozu Auto. Tenn., Inc.*, 454 F.3d 549, 556 (6th Cir. 2006) (citing *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005)).

Defendant argues that Plaintiff cannot establish the fourth element of his prima facie case: that he provided Defendant with notice of his intent to take leave. "[T]o invoke the protection of the FMLA, an employee must provide notice and a qualifying reason for requesting the leave." *Brohm v. JH Props., Inc*., 149 F.3d 517, 523 (6th Cir.1998). "When the approximate timing of the need for leave is not foreseeable, an employee must provide notice to the employer as soon as practicable under the facts and circumstances of the particular case." 29 C.F.R. § 825.303(a). The FMLA permits employers to condition FMLA-protected leave upon an employee's compliance with the employer's usual notice and procedural requirements, absent unusual circumstances. *See* 29 C.F.R. § 825.303(c) ("[w]hen the need for leave is not foreseeable, an employee must comply with the employer's usual and customary notice and procedural requirements for requesting leave, absent unusual circumstances.") *See also Srouder v. Dana Light Axle Manufacturing, LLC*, 725 F.3d 608, 614 (6th Cir.2013) ("we hold that an employer may enforce its usual and customary notice and procedural requirements against an employee claiming FMLA-protected leave, unless unusual circumstances justify the employee's failure to comply with the employer's requirements.").

In terms of content, the critical test is "whether the information that the employee conveyed to the employer was reasonably adequate to apprise the employer of the employee's request to take leave" covered by the FMLA. *Brohm,* 149 F.3d at 523 (quotations and citations omitted).

> When an employee seeks leave due to a qualifying reason, for which the employer has previously provided the employee FMLA-protected leave, the employee must specifically reference either the qualifying reason for leave or the need for FMLA leave. Calling in "sick" without providing more information will not be considered sufficient notice to trigger an employer's obligations under the Act. The employer will be expected to obtain any additional required information through informal means. An employee has an obligation to respond to an employer's questions designed to determine whether an absence is potentially FMLA-qualifying. Failure to respond to reasonable employer inquiries regarding the leave request may result in denial of FMLA protection if the employer is unable to determine whether the leave is FMLA-qualifying.

29 C.F.R. § 825.303.

Under the Labor Agreement, employees must notify human resources of intended absences due to sickness prior to the start of a shift. Labor Agreement 55. However, an employee may notify human resources within the first hour of the employee's scheduled shift if he "was unable 'for good reason' to notify the Company prior to the start of the shift[.]" *Id.*

Because Plaintiff did not inform human resources of his FMLA absence prior to the start of his shift, under the Labor Agreement Plaintiff was required to show good reason for failing to do so. Plaintiff has presented no evidence that he informed Mr. Whittredge, or Defendant, of any good reason for his late notice. The contradictory rationales Plaintiff offers in his deposition testimony for his tardiness on July 29, 2015 also do not demonstrate unusual circumstances such that deviation from Defendant's standard notice procedures is warranted. *See* 29 C.F.R. § 825.303(c). Although Plaintiff submits that he probably was having an anxiety attack in the morning when he woke up, he then states that he did not call Defendant at that time because he "probably didn't feel that stressed out right then." Levaine Dep. 137-38. Plaintiff then hypothesizes that he probably left late, or that traffic was bad, or that he felt suicidal while driving. *Id*. These conjectural justifications do not establish unusual circumstances such that Plaintiff is excused from following Defendant's standard notice procedures. Plaintiff has not

made out a prima facie case of FMLA interference, and Defendant's motion for summary judgment will be granted as to this claim.

**ii.**

Plaintiff Levaine also brings a claim of FMLA retaliation, alleging that Defendants discriminated against him in retaliation for asserting his rights to intermittent FMLA leave and filing a complaint with the U.S. Department of Labor. *See* Compl. ¶¶ 63-64.   The central question in an FMLA retaliation case is "whether the employer took the adverse action because of a prohibited reason or for a legitimate nondiscriminatory reason." *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir.2006).   In answering that question, "[t]he employer's motive is relevant because retaliation claims impose liability on employers that act against employees specifically because those employees invoked their FMLA rights." *Id.*

**a.**

Plaintiff first alleges that he has presented direct evidence of FMLA retaliation. In support of that claim Plaintiff points to the following deposition testimony of Defendant's human resources manager, Gretchen Roestel, who was a decision maker in Levaine's termination:

> Q:   So there was a discipline issue that arose of an attendance issue with Mr. Levaine, correct?
>
> A:   Correct.
>
> Q:   Was that attendance issue related to the, to your recollection, was that related to his Family Medical Leave, to his approved leave that he had with FMLA?
>
> A:   Yes I believe that the attendance issue – yes I believe that this was the one where he was a few minutes tardy and he claimed FMLA when he got to work
>
> Q:   And it was that tardy that Mr. Kreider was issuing the discipline, is that correct?
>
> A:   Yes.

- 20 -

*See* Roestel Dep. 40, Resp. to Summ. J. Ex. G. Contrary to Plaintiff's contention, Ms. Roestel's testimony does not constitute direct evidence that Defendant terminated Plaintiff for exercising his statutory right to FMLA leave. Instead, Ms. Roestel was just explaining the sequence of events underlying the disciplinary meeting held on July 31, 2015. Her testimony is not an admission, especially since Plaintiff has established no right to FMLA leave on July 29, 2015 due to his insufficient notice.

**b.**

Because Plaintiff has presented no direct evidence of discrimination, his claim must be analyzed under the familiar *McDonnell Douglas* burden-shifting framework. Plaintiff has the initial burden of establishing a prima facie case of retaliation by showing: (1) he was engaged in a statutorily protected activity; (2) Defendant knew that he was exercising his FMLA rights; (3) he suffered an adverse employment action; and (4) a causal connection existed between the protected FMLA activity and the adverse employment action. *Donald v. Sybra, Inc.,* 667 F.3d 757, 761 (6th Cir.2012) ("There is no doubt that this Court applies the McDonnell Douglas burden-shifting framework to FMLA retaliation suits when the plaintiff produces indirect evidence of a causal connection between the protected activity and the adverse employment action.").

In his complaint Plaintiff alleges that he was retaliated against specifically for filing a complaint with the Department of Labor and for asserting his rights to intermittent leave under the FMLA.  *See* Compl. ¶¶ 63-64.  It is clear that Plaintiff has satisfied the first three elements of his prima facie case. He applied for FMLA leave to care for his own serious medical condition, which was approved on November 19, 2013, and recertified on July 31, 2014. *See* Mot. for Summ. J. Ex. N. It is uncontested that Plaintiff exercised his right to intermittent FMLA leave on

numerous occasions.  It is also uncontested that Plaintiff filed a complaint with the Department of Labor in January of 2014.  Plaintiff therefore was engaged in a statutorily protected activity, and Defendant therefore knew that Plaintiff was engaged in a statutorily protected activity.  The fact that Plaintiff may not have had a statutory right to FMLA leave on July 29, 2016, or that Defendant did not have notice Plaintiff was exercising his FMLA rights on that date does not alter this analysis for the purpose of Plaintiff's prima facie case. Furthermore, it is undisputed that Plaintiff suffered an adverse employment action when his employment with Defendant Tower was terminated.

In its motion for summary judgment, Defendant argues that Plaintiff has failed to establish a prima facie case of FMLA retaliation under the fourth prong. Plaintiff argues that there is a causal connection between his exercise of rights under the FMLA and his termination because his termination occurred less than a week after he attempted to exercise his right to intermittent FML leave.  To the contrary, the fact that Plaintiff's termination occurred following a meeting in which Plaintiff and his supervisors disputed whether his tardiness was properly covered by intermittent FMLA leave does not establish causation, because Plaintiff did not establish any right to FMLA leave on that date. *See Brohm,* 149 F.3d at 523 ("nothing in the statute places a duty on an employer to affirmatively grant leave without such a request or notice by the employee. Rather, to invoke the protection of the FMLA, an employee must provide notice and a qualifying reason for requesting the leave." Plaintiff raises no further arguments in support of his claim that there was a causal connection between his exercise of FMLA rights and his termination. Plaintiff therefore has not carried his burden of establishing a prima facie case of FMLA retaliation.

**c.**

Even if Plaintiff had established a prima facie case – which he has not – his FMLA retaliation claim would still fail.  Once a plaintiff establishes a prima facie case the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse employment action.  *See Donald*, 667 F.3d at 762. To do so, the employer must "prove it had a legitimate reason unrelated to the exercise of FMLA rights for terminating the employee." *Id.* Defendant Tower claims that it terminated Plaintiff Levaine's employment because he threatened a supervisor in violation of the company's anti-harassment policy. Specifically, Defendant alleges that after Plaintiff was informed that he would be disciplined for being tardy on July 29, 2015, Plaintiff waived the discipline papers in Mr. Kreider's face and yelled "I'll get you for this!!"

### d.

Because Defendant has articulated a legitimate reason for its action, the burden of production shifts back to Plaintiff to demonstrate that Defendant's reason is pretextual.  The plaintiff may "rebut the employer's reason by showing that the proffered reason had no basis in fact, did not motivate the termination, or was insufficient to warrant the termination," under the familiar tripartite test from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, (1973). *Donald*, 667 F.3d at 762.

### 1.

Plaintiff Levaine first attempts to show pretext through the first method, arguing that Defendant's alleged reason for terminating him had no basis in fact, and that "Defendants concocted an elaborate story that Mr. Levaine had threatened physical harm to Defendant's manager" in order to hide the fact that it had terminated him for exercising his rights to intermittent FMLA leave.  Levaine alleges that Defendant's investigation was flawed because

Ms. Roestel incorrectly identified some dates and did not personally interview Plaintiff Levaine, instead allowing a junior employee to do so. Plaintiff also alleges that Defendant could not have reasonably believed Plaintiff threatened his supervisor because it did not respond in sufficiently prompt or serious manner.

In arguing that Plaintiff did not satisfy his burden of showing that Defendant's proffered reason for terminating her employment has no basis in fact, Defendant relies on the "honest belief rule." The honest belief rule provides that "as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect." *Majewski v. Automatic Data Processing, Inc., 274 F.3d 1106, 1117 (6th Cir. 2001)*. To determine whether Defendant had an honest belief that Plaintiff threatened a supervisor, the Court must look "to whether [Defendant] can establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Braithwaite v. Timken Co.,*258 F.3d 488, 494 (6th Cir. 2001). In this regard, the decisional process used by the employer need not be optimal or leave "no stone unturned." *Smith v. Chrysler Corp.*, 155 F.3d at 807. "Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Id*. Although the Court must not "blindly assume that an employer's description of its reasons is honest," the Court should "resist attempting to micro-manage the process used by employers in making their employment decisions." *Id*. "When the employee is able to produce sufficient evidence to establish that the employer failed to make a reasonably informed and considered decision before taking its adverse employment action, thereby making its decisional process 'unworthy of credence,' then any

reliance placed by the employer in such a process cannot be said to be honestly held." Id. at 807-08.

In his deposition, Plaintiff concedes that "I took my right hand, I had the paper – the write up in my hand, I had my left hand by my side and I said I'm going to get you *on this*. That's what I said to him." Levaine Dep. 131 (emphasis added).  Plaintiff therefore concedes that the incident took place. It is immaterial whether Plaintiff yelled "I'll get you on this" or "I'll get you for this." Both witnesses testified that they took Levaine's statement as a threat, and one of the witnesses was Levaine's own union steward.  Furthermore, all three persons present at the disciplinary meeting consistently testified that Levaine was agitated, worked up, upset, and yelling. *See* Shears Dep. 9- 11, 16; Kreider Dep. 9, Muether Dep. 13, 14, 22.

After the incident, Defendant followed its standard procedures for investigating work place threats, taking written statements from all involved parties.  Defendant was not required to find that Levaine was carrying a weapon, nor was it required to find that Levaine was an immediate risk of extreme physical violence to determine that he had threatened a supervisor in violation of its anti-harassment policy. *See* Employment Practices 7. Plaintiff's deposition concession together with the testimony of all witnesses of the incident demonstrates that Defendant reasonably believed that Plaintiff threatened a supervisor.

**2.**

Plaintiff also cannot argue that the threat was insufficient to warrant the termination because Plaintiff conceded in his deposition that he was familiar with Defendant's anti-harassment policy, and knew that the policy meant that employees "cannot harass or threaten a foreman or anything like that.  Everybody knew in the shop because people had got fired before for it." Levaine Dep. 65-66.  Plaintiff therefore cannot establish pretext under the second method.

**3.**

Plaintiff also has not satisfied his burden of proving that the alleged threat did not actually motivate the termination of his employment under the third method of proving pretext. To establish pretext by advancing some evidence that the proffered explanation did not actually motivate the discriminatory action, a plaintiff can "attack[] the employer's explanation 'by showing circumstances which tend to prove an illegal motivation was more likely than that offered by the defendant. In other words, the plaintiff argues that the circumstantial evidence of discrimination makes it more likely than not that the employer's explanation is a pretext, or coverup." *Smith v. Leggett Wire Co*., 220 F.3d 752, 759 (6th Cir. 2000) (citation omitted) (quoting *Manzer*, 29 F.3d at 1084) (internal quotation marks omitted). To make a showing of pretext in this manner, "plaintiff may not rely simply upon his prima facie evidence but must, instead introduce additional evidence of ... discrimination." *Manzer*, 29 F.3d at 1084. A plaintiff's "feeling" that retaliation or discrimination is the cause of the adverse employment action is insufficient to show pretext; the plaintiff must offer evidence that the adverse action was actually in retaliation for specific protected conduct. *See Booker v. Brown & Williamson Tobacco Co*., 879 F.2d 1304 (6th Cir. 1989).

Plaintiff argues that the temporal proximity between his request to use FMLA leave and his termination support an inference of pretext. While temporal proximity may create an inference of causal connection for the purpose of establishing a prima facie case, temporal proximity alone is insufficient to establish pretext. *See Skrjanc v, Great Lakes Power Service, Co.*, 272 F.3d 309, 317 (6th Cir. 2001). Furthermore, as noted above, the fact that Plaintiff's termination occurred shortly after he sought intermittent FMLA leave is irrelevant because Plaintiff did not establish any right to FMLA leave on that date. *See Brohm,* 149 F.3d at 523.

Plaintiff also, again, points to Ms. Roestel's deposition testimony as direct evidence of termination.  However, as already discussed above, Ms. Roestel did not state that Levaine was terminated for exercising his rights under the FMLA, but simply explained the sequence of events underlying the disciplinary meeting held on July 31, 2015.  *See* Roestel Dep. 40.  Even accepting Levaine and his co-worker Jonathan O'Connor's allegations that Levaine was subjected to unfair treatment by his supervisors, Plaintiff has presented no evidence, other than his own subjective belief, that the unfair treatment was in response to protected conduct under the FMLA.  Plaintiff's FMLA retaliation claim is therefore without merit and will be dismissed.

### III.

Because Plaintiff's federal claims will be dismissed on the merits, Plaintiff's related state law claims will be dismissed without prejudice. A federal court may exercise supplemental jurisdiction over a plaintiff's state law claims if they form part of the same controversy as the federal claim. *See* 28 U.S.C. § 1367(a).  A federal court may decline to exercise supplemental jurisdiction over a claim if:

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). When a plaintiff's federal claims have been dismissed on the merits, the question of whether to retain jurisdiction over any state law claims rests within the court's discretion. *Blakely v. United States*, 276 F.3d 853, 860 (6th Cir. 2002).  However, the dismissal of the claims over which the federal court had original jurisdiction creates a presumption in favor

of dismissing without prejudice any state-law claims that accompanied it to federal court. *Id.* at 863. In addition, "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966). The issues presented are more appropriate for resolution by a state court and therefore the Court declines to exercise its supplemental jurisdiction. Plaintiffs' supplemental state law claims will therefore be dismissed without prejudice.

## IV.

Accordingly, it is **ORDERED** that the hearing scheduled for May 25, 2016, at 4:00 p.m. is **CANCELLED** because oral argument will not aid in the disposition of the motion. E.D. Mich. L.R. 7.1(f)(2).

It is **ORDERED** that Defendants Tower's Motion for Summary Judgment, ECF No. 28, is **GRANTED.**

It is further **ORDERED** that Count 2, Count 4, and Count 5 of Plaintiff Levaine's complaint, ECF No. 1, are **DISMISSED with prejudice**.

It is further **ORDERED** that Count 3 and Count 6 of Plaintiff Levaine's Complaint, ECF No. 1, are **DISMISSED without prejudice**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: May 18, 2016

- 28 -

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on May 18, 2016.

s/Michael A. Sian
MICHAEL A. SIAN, Case Manager